## THOMAS R. BOND *vs.* J. WILSON HUMBIRD.

*Real estate brokers: commissions. Construction of contracts;
surrounding circumstances.*

A broker can not recover commissions on a sale he was not
employed or authorized to make, unless his unauthorized act
was afterwards ratified.                                    p. 657

Where there is no evidence whatever that a vendor of real estate
has ratified or approved of anything done by a broker who
claims commissions on the sale, and no parol evidence is
in the case from which it could be inferred that the broker
had been authorized by the vendor to effect a sale of the
property, it is the province of the Court, and not of the jury
to determine the legal effect of letters between the parties, on
which the broker bases his claim.                    pp. 657, 658

Where a contract is based upon written evidence alone, it is
for the Court to ascertain and determine its construction
and effect.                                                p. 658

The object of all judicial interpretation in construing contracts
is to discover and declare the intention of the parties thereto.
                                                           p. 658

What was the meaning of the parties to a written contract
must be gathered from what the parties actually said, as
viewed from the standpoint they then occupied.        p. 658

A letter from a real estate broker requesting the owner of land
to give information as to whether the land was for sale, and
if so for what price, and what was its acreage, etc., so that
the broker might submit the same to a customer, and the let-
ter of the owner in reply, merely giving the price and acreage,
etc., of the land, does not constitute a contract of employ-
ment, or authorize the broker to act as the agent in the sale.
                                                           p. 658

*Decided November 14th, 1912.*

Appeal from the Circuit Court for Allegany County
(HENDERSON, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

The facts are stated in the opinion of the Court.

*Robert H. Williams* and *W. C. Devecmon,* for the appellant.

*D. Lindlay Sloan,* for the appellee.

BURKE, J., delivered the opinion of the Court.

The Trustees of the estate of the late Jacob Humbird owned nine tracts of land situated in St. Mary's county. Maryland, and containing in the aggregate about 2800 acres. Under appropriate proceedings had in the Circuit Court for St. Mary's County this property was sold by the Trustees in December, 1910, to J. Wilson Humbird for the sum of $50,000.00.

On the 6th day of January, 1911, J. Wilson Humbird and wife granted and conveyed the property to the National Slavonic Society of the United States, a corporation, in consideration of the sum of $70,000.00 cash. On November 30th, 1910, Thomas R. Bond, who is a licensed real estate broker residing in Baltimore City, made a demand upon J. Wilson Humbird for the payment of commissions on the sale of the property to the Slavonic Society, and upon his refusal to pay, Mr. Bond instituted a suit against him in the Circuit Court for Allegany County. At the conclusion of the plaintiff's case, the Court, upon the request of the defendant, directed a verdict for and entered a judgment in favor of the defendant upon the ground that the plaintiff had offered no evidence legally sufficient to entitle him to recover. This appeal, which presents the single question as to the correctness of that ruling, was taken by the plaintiff from that judgment.

The declaration contained the six common counts, and two special counts. The special counts set out the facts upon

which the plaintiff relied to fix liability upon the defendant. The seventh, or first special count alleged that the defendant was authorized by the owners, who were the Trustees of the estate of Jacob Humbird, to sell the property, and that on the 14th day of December, 1908, he did "employ the plaintiff, a duly licensed real estate broker, resident in the City of Baltimore, and known as such to the defendant, and did authorize and employ him, the said .plaintiff, to offer for sale the said property." The declaration then alleged that "by virtue of such authority and employment it was agreed and understood by and between the plaintiff and defendant," that the defendant would pay a reasonable commission to the plaintiff in case the plaintiff should effect a sale of the property upon terms acceptable to the defendant. It then alleged that the plaintiff did find a purchaser for the property in the person of one Joseph Joscak, "acting as agent of the National Slavonic Society of the United States of America, a corporation, and the plaintiff further says that he placed Joscak in communication with said defendant, and that thereupon said defendant made sale to the said National Slavonic Society for the sum of $70,000.00; and that said plaintiff further says that he was the procuring cause of said sale; and that upon the consummation thereof he became and was entitled to have and receive from said defendant the usual and ordinary broker's commission charged in such cases." The eighth count, although it sets out the facts with more fulness of detail, rests the liability of the defendant upon precisely the same ground stated in the seventh count, viz: the employment of the plaintiff by the defendant to make the sale and the negotiation of the sale by the plaintiff.

It is obvious upon an examination of the record that the plaintiff bases his authority as agent of the defendant to make the sale upon two letters,—one from himself to the defendant dated December 14th, 1908, and the defendant's reply thereto dated December 15th, 1908. This is clear both from the allegations of the *narr.,* and from the letter of Mr. Robert H. Williams, the attorney for the plaintiff, to the

defendant dated November 30th, 1910, in which a demand was made for the payment of commissions on the sale.

In that letter Mr. Williams said: "At Mr. Bond's request I now make formal demand on you for the amount of the commissions on the sale of all the property in St. Mary's county which you placed in Mr. Bond's hands for sale by letter of December 15th, 1908, with memorandum attached thereto, naming the farms for sale with acreage."

On the following day, Mr. Humbird replied to this letter, and stated that he had "no records of having placed any property in the hands of Mr. Bond for sale," and he asked that Mr. Williams send him copies of the letters referred to. He further stated that the property in St. Mary's County belonged to the estate of Jacob Humbird and was represented by trustees, and that he had no authority to pay commissions. He further said that "perhaps you only have the prices that were asked for the various properties."

It is not pretended that the plaintiff prior to December 15th, 1908, had any authority to represent the defendant in the sale of the property. Several years before that date he had met Mr. Humbird on one occasion in the office of Kennard & Co., real estate brokers in Baltimore City. At that time the plaintiff had a customer who wanted to buy some timber land, and he talked with the defendant about the timber on the farms then in Kennard's hands for sale; but it was found that the quantity of timber on these farms was not sufficient to interest his customer.

No further communications appear to have been had between the plaintiff and the defendant until December 14, 1908. On that day the plaintiff wrote and mailed to the defendant a letter of which the following is a copy:

"Dec. 14, 1908.

Mr. J. W. Humbird,

Cumberland, Md.

Dear Sir: I have an inquiry from an out-of-town party who wants to buy a large tract of land in Maryland. I was referred to Mr. Thos. Brome, St. Mary's County, as having in

.charge a large tract known as Snow Hill, etc. I wrote to Mr. Brome in reference to the land and he referred me to you. If the property is for sale, and you will send me a description of the same with the price, I will submit it to my party. Hoping to hear from you, I am,

Yours respectfully,"

When this letter was written the plaintiff was under the impression that Mr. Brome was the agent having the properties in charge, and he testified that the out-of-town person referred to in his letter was a man named Cyne Leeski. The defendant replied to this letter as follows:

"CUMBERLAND, MD., December 15th, 1908.

MR. THOMAS R. BOND,

DEAR SIR: Yours of the 14th inst. in reference to lands in St. Mary's received. The lands are located on the St. Mary's river, St. Mary's county, Md., and consist of several farms, containing in the aggregate about 2,813 acres as per memoranda on separate page—of which you will observe about 1,175 cleared land and 1,638 in timber. Assuming that the St. Mary's river runs north and south, the properties lie on the east side of the St. Mary's river and on the west of St. Inigoes Creek, occupying most of the land between the two streams. St. Mary's harbor fronts on the property. The stream is navigable for bid boats. The Snow Hill property is beautifully located at the head of the harbor. The view from this point has been very much admired. I ask in figures $7,000.00 for the Snow Hill property.

Yours very respectfully,"

Enclosed in this letter was a memorandum giving the prices of the several farms, aggregating the sum of $52,000.00. This was the only letter written by the defendant to the plaintiff, except the one above mentioned in which he said he had no record of ever having placed the property in Mr. Bond's hands for sale.

The plaintiff, however, wrote four subsequent letters to the defendant, but to none of these did the defendant reply:

First, in August, 1909, he wrote that he had an inquiry for a farm on Horse Shoe Bend, St. Mary's County, and asked the defendant if he would sell a hundred acres at that point and at what price. He suggested in this letter the advisability of cutting the properties up into small places of fifty to a hundred acres each. Second, on October 30th, 1909, he wrote that he had an inquiry for a large tract, and asked if the prices for the property were the same as those formerly submitted. He also asked for a rough plat of the different farms, and how they were located with reference to the water front.

The two other letters are here transcribed: .

First—

"November 17, 1909.

Mr. Humbird,

Cumberland, Md.

Dear Sir: Mr. F. W. Valiant, who is a representative of mine in St. Mary's county, informs me this morning that he has taken a Mr. Jos. Joscak down to see your property in St. Mary's City which you gave me a description of last winter. Mr. Valiant writes me that Mr. Joscak seems very much interested in the property, and is to spend several days at Mr. Broom's looking it over.

I have written you several letters recently for a fuller description of the property, but my letters have been unanswered. Will you kindly answer this letter and give me full particulars up to date, and we may be able to make a deal for you. Hoping to hear from you, I am,

Yours very respectfully,"

Second—

"October 5, 1910.

Mr. Humbird,

Cumberland, Md.

Dear Sir: Under date of Nov. 17, 1909, I wrote you that Mr. F. W. Valiant, a representative of mine in St. Mary's county, had taken a Mr. Jos. Joscak to see your property at

Broom's Wharf, of which you had sent me a description sometime previous.

I now understand from Mr. Valiant that Mr. Joscak and his people, the National Slavonic Society, have bought the property. As neither you or Mr. Joscak notified us, I would like for you to write me and let me know the particulars.

Mr. Valiant took Mr. Joscak down to see the property so that there can be no doubt about these people being our clients. Hoping to hear from you at an early date, I am,

Yours very truly,"

The evidence shows that the National Slavonic Society in June, 1909, appointed a committee to look up lands suitable for an asylum which it proposed to establish. Mr. Joscak was a member of that committee. He met Mr. Valiant about the 13th of November, 1909, and was taken by him to the Humbird property. He stopped for three nights at the residence of Mr. Brome, and carefully examined the property. He made two other visits to the property, the last one on December 16th, 1909, in company with a number of other members of the committee, and on this occasion the committee rejected the property as unsuitable.

Mr. Joscak, in a letter to Mr. Valiant, dated March 26th, 1910, stated: "The Humbird property *was not bought,* but the committee of 14, including myself, went to look at it. It was, however, the society's lawyer who made Mr. Humbird to state figures on the tract and he arranged the excursion; but the matter of buying was set aside. The principal objection for that country around you, was that there is much malaria, and is therefore undesirable to build an establishment such as we propose to build."

At the annual meeting of the society in May or June, 1910, the committee of which Joscak was a member, resigned, and a new committee, of which he was not a member, was appointed to secure a desirable property for the proposed asylum. This committee, in company with Mr. Joscak, visited the Humbird property, and the society in August, 1910,

decided to buy it, and the sale was finally consummated on the 6th of January, 1911.

There is nothing in the record to show when or under what circumstances the purchaser first took up the question of sale with Mr. Humbird, or when the contract of sale was entered into; but it does appear from the letter of Mr. Joscak to which reference has been made that the attorney for the society at some time prior to March 26th, 1910, had taken up the matter with the appellee.

We have now stated all the material and essential facts of the plaintiff's case, and the question to be determined is: Are they legally sufficient to entitle him to recover?

The general principles of law applicable to cases of this kind have been repeatedly announced in a long line of decisions in this Court. Speaking generally, it may be said to be well established that a broker can not recover commissions on a sale he was not employed or authorized to make, unless his unauthorized act has been ratified by the owner. This was distinctly held in the case of *Moore* v. *Councilman*, 115 Md. 629. In the absence of ratification, or the existence of circumstances which estop the owner to deny the authority of the broker to make the sale,—and no such circumstances appear in this record,—a broker who has made a sale without authority either expressed or implied can not recover. The general rule is that it is essential for him to show a delegated authority to act.

Now, in this case, assuming that the correspondence of December 14th and 15th, 1908, did not constitute the plaintiff the agent of the defendant to make the sale, it would appear to be clear that the plaintiff can not recover, because there is no evidence whatever to show that Mr. Humbird ratified or approved of anything he had done; nor is there the slightest parol evidence from which it could be reasonably inferred that the plaintiff was authorized by the appellee to effect a sale of the property.

It was, therefore, the duty of the Court, and not the province of the jury, to determine the legal effect of the two letters of December 14th and 15th, 1908.

We said in *Roberts* v. *Bonaparte,* 73 Md. 191, that "the general rule undoubtedly is that the construction of all written documents is a question of law for the Court, and when a contract is sought to be made out from such documents alone, it is for the Court to ascertain and determine its construction, whether the documents are many or few."

The object of all judicial interpretation is to discover and declare the intention of the parties as expressed in the written documents. Obviously, the most simple and satisfactory way to ascertain that intention is to read what they have written in the light of surrounding circumstances existing at the time. What they meant to say must be gathered from what they did say, as viewed from the standpoint they then occupied.

Examining these two letters in the light of these simple, but well settled rules of construction, it is difficult to see how it can be claimed that they constitute a contract of employment, or confer upon the plaintiff any authority to represent the defendant in the sale of the property. Evidently at that time such a relation was not in the contemplation of either party.

The letter of December 14th, 1908, is simply a request for information. The plaintiff's out-of-town customer, Mr. Leeski, wanted to buy a large tract of land, and the plaintiff wished to know if the Humbird land was for sale and at what price. If the properties were for sale the defendant was asked to send a description of the same with the price, in order that the plaintiff *might submit it to his customer.* There is nothing in the letter to suggest to the defendant that Mr. Bond desired to be employed or authorized by the defendant to act as his agent in the sale. This was evidently not intended.

The defendant's reply—letter of December 15th, 1909—merely furnished the information desired; but contained no expression that would indicate an intention on his part to constitute the plaintiff his agent to deal with the property in any way. We are, therefore, of opinion that the case was properly withdrawn from the consideration of the jury by the granted prayer.

The case of *Blake* v. *Stump,* 73 Md. 160, upon which the plaintiff placed some reliance at the hearing, presented a situation quite unlike the one we are here dealing with in two important particulars—first, the evidence to support the contract of agency was wholly oral; and secondly, there was legally sufficient evidence offered to prove the contract. Under such circumstances, it was proper to submit the question of contract *vel non* to the finding of the jury.

*Judgment affirmed, with costs.*